# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>DANIEL LEE CARPENTER,<br><br>Appellant. | No. 59413-7-II<br><br><br>UNPUBLISHED OPINION |

VELJACIC, A.C.J. — Daniel Lee Carpenter appeals his conviction for one count of failing to register as a sex offender in violation of RCW 9A.44.130(6)(a). Carpenter contends that the trial court abused its discretion by denying his request to retain a private defense attorney, violating his right to counsel guaranteed by the Sixth Amendment to the United States Constitution. Second, Carpenter argues that insufficient evidence supports his conviction. And third, for the first time on appeal, Carpenter argues that the trial court again violated his Sixth Amendment right by depriving him of the ability to privately confer with counsel. In his statement of additional grounds for review (SAG), Carpenter asserts that his ex-husband, Keegan Patterson, should not have been allowed to testify against him at trial; the State violated a plea agreement that would have resulted in his charge being dismissed; and defense counsel rendered ineffective assistance of counsel. We affirm Carpenter's judgment and sentence.

FACTS

## I.  BACKGROUND

Carpenter, a registered sex offender,[1] lived with his then-husband, Keegan Patterson, in Longview.[2]  Patterson purchased a duplex in 2019.  Only Patterson's name was on the deed.[3]

Carpenter moved in after he was released from prison in November 2020.  Prior to his release, Carpenter met with Jason Hammer, the Registered Sex Offender (RSO) detective for the Cowlitz County Sheriff's Office.  Hammer met with Carpenter in the RSO office and "went through the registration process" and "the rules and obligations of the offender."  2 Rep. of Proc. (RP) at 64-65.  This included going over the requirements regarding offenders who move to a new address.  Carpenter did not express any confusion about these requirements.

Carpenter registered the residence as his "fixed residence" as required by RCW 9A.44.130(1)(a) at his meeting with Hammer.  The residence was "basically a duplex" because it is "a house that's broken into two sections."  2 RP at 88.  Carpenter and Patterson would occasionally rent out the other unit of the duplex for Airbnb.

## II.  CARPENTER'S VIOLATION

After Carpenter moved in with Patterson, things began to deteriorate; "[i]t was a rocky relationship."  2 RP at 86.  Around February 20, 2021, the couple got into a fight, and Patterson kicked Carpenter out.  Carpenter left the residence in "a U-Haul rental truck."  2 RP at 75.

---

[1] Carpenter was previously convicted of rape of a child in the third degree and attempted sexual exploitation of a minor.

[2] Around November 2020, Patterson and Carpenter considered themselves to be legally married, but it was later determined that the couple was in fact not legally married.

[3] Carpenter testified that he and Patterson had bought the house together while Carpenter was in prison.

Carpenter left some of his property at the residence, including his RV and a dog that he had adopted. Carpenter would get some mail at the residence, but it eventually "stopped coming altogether." 2 RP at 78.

According to Patterson, Carpenter, following the fight, ceased to live at the residence. Patterson testified that Carpenter was "hardly ever" at the residence, estimating that Carpenter was there "less than once a week." 2 RP at 77. Carpenter did not "stay in the house," nor did he stay in his RV that was parked in the backyard. Carpenter never spent the night.

Patterson had cameras at the residence, but he was not aware of Carpenter "coming to the residence after February 20." 2 RP at 79-80. Patterson acknowledged that he did not "review every minute of the footage, but he reiterated that "there was no reason for [him] to believe that [Carpenter] had been there." 2 RP at 80. In other words, Carpenter "was not at the residence at all." 2 RP at 75. Patterson did confirm that the RV was at the residence after the fight.[4]

According to Carpenter, he "would come and go" while living with Patterson. 2 RP at 86. They had an abusive relationship and "sometimes[, Carpenter] wouldn't come home because [he] was scared." 2 RP at 86. Carpenter testified that he was at the residence "[a]t least four" days a week. 2 RP at 86.

On March 13, Longview Police detective Richard Gibbs was validating addresses for registered sex offenders. Gibbs went to Carpenter's registered address in Longview, and Carpenter was not present. Gibbs "made contact with . . . Patterson," who explained that "Carpenter ha[d] not lived at the residence since" February 18. 2 RP at 71; Clerk's Papers (CP) at 5. Gibbs went "inside the residence," but his tour was brief; he did not walk through the house to see any evidence

---

[4] Carpenter testified the RV was allegedly hauled off by Patterson "sometime in February," presumably after the February 20 incident. 2 RP at 88.

of Carpenter living there. 2 RP at 72. Despite this, Gibbs concluded that he had "no reason to believe anybody besides [Patterson] . . . was living there." 2 RP at 72.

At no point between February 20 to March 15, did the Cowlitz County Sheriff's Office "receive any notification that . . . Carpenter updated his address." 2 RP at 82.

On July 22, the State charged Carpenter with one count of failure to register as a sex offender in violation of RCW 9A.44.132(1)(b). Carpenter was already incarcerated at the Washington Corrections Center in Shelton on an unrelated matter.

III.    2022 PRETRIAL PROCEEDINGS

Carpenter appeared before the Cowlitz County Superior Court on April 26, 2022. At his initial appearance, defense counsel explained that Carpenter had an attorney that previously represented him in a civil matter that was also working on the current case and was in communication with the prosecutor's office. Carpenter indicated that there was a deal in place that would result in the State dismissing the charges if he went to treatment. The State explained that it had "nothing to indicate that there was a deal in place to dismiss [the] case," noting that it had not seen "any plea agreement [that had] been made in writing." 1 RP at 7-8.

On April 28, Carpenter pled not guilty to one count of failure to register as a sex offender. At this hearing, appointed counsel informed the court that they had spoken with Kirk Davis, the attorney that previously represented Carpenter in a civil matter, who stated they were "going to be entering a Notice of Appearance in [the] matter, moving forward." 1 RP at 12.

In light of an available bed at the American Behavioral Health Systems in Chehalis, the court released Carpenter on his own recognizance. The court scheduled Carpenter's jury trial for July 19.

4

Carpenter was in and out of custody in Lewis County on unrelated matters. Because of this, Carpenter failed to appear in Cowlitz County, and the court issued a bench warrant.

IV.     2024 PRETRIAL PROCEEDINGS

On February 6, 2024, almost two years after Carpenter's initial appearance, Carpenter appeared for his trial readiness hearing. Carpenter appeared virtually because he was in custody in Lewis County. The court noted that it was the sixth trial setting for the case and wanted to set trial for the week of February 12.

Carpenter opposed moving forward. The court inquired if Carpenter was willing to waive his right to a speedy trial. Carpenter said,

> I haven't had an opportunity to talk to [defense counsel] about [my defense]. I've been in and out of mental health treatment over the last couple of years, and we haven't really been able to touch base about any kind of defense whatsoever. I've never actually [sat] down with [my attorney] and say this is what my defense is; haven't talked about witnesses; or anything.

1 RP at 28. Defense counsel replied, "That's not exactly accurate, Mr. Carpenter. I've talked to you many times." 1 RP at 28.

The court set trial for February 14, but informed defense counsel that they could request a continuance after speaking with Carpenter. At no point during this hearing did the court inform Carpenter of his ability to confer with counsel privately. Neither Carpenter nor his counsel argued that he was unable to confer privately with counsel.

After the February 6 hearing, Carpenter filed a motion for a continuance under CrR 3.3(f). Carpenter explained that he wanted "to meet with counsel regarding witnesses he may have for trial and possibly hir[e] a Seattle attorney, Kirk Davis[,] to appear." CP at 72. To be clear, Carpenter's motion requesting a continuance was filed *after* his trial readiness hearing. At no point

5

during the trial readiness hearing did Carpenter suggest that he wanted a continuance to retain private counsel.

On February 9, five days before trial was to commence, the court considered Carpenter's motion for a continuance. Again, Carpenter appeared remotely. Defense counsel explained that a continuance was needed because Carpenter had witnesses that needed to be interviewed, and "he also [had] another attorney in Seattle [(presumably Kirk Davis)] that he [had] a possibility of hiring." 1 RP at 31. Carpenter subsequently waived his right to a speedy trial.

The State opposed granting a continuance. The State remarked that the "case [had] been going since 2021." 1 RP at 32. The State also explained that Carpenter provided no information regarding the witnesses he wanted to interview, nor had there been a notice of appearance "filed by a new attorney." 1 RP at 32. In its view, Carpenter was employing "a delay tactic . . . to avoid going to trial." 1 RP at 32-33.

The court denied Carpenter's request for a continuance. The court found that a continuance was not appropriate in light of the request being made "less than a week prior to trial." 1 RP at 34. Again, the court did not inform Carpenter of his ability to confer with counsel privately during the hearing. And Carpenter also did not argue that he was unable to confer with counsel privately during the hearing.

V.    TRIAL

On the morning of trial, Carpenter waived his right to a jury. Carpenter, who was physically present in the courtroom, then requested that he be allowed to hire his own attorney. But this time, Carpenter claimed that a different attorney, Christopher Baum, had "agreed to represent" him. 2 RP at 60. The following exchange took place:

> [CARPENTER]: . . . I'm just asking you to give me time to hire my own attorney, private attorney.

> [DEFENSE COUNSEL]: Your Honor, [I have] represented . . . Carpenter for a year.  In that time, no one has come forward saying that [they are] retained counsel.  I think [it is] pretty late.
>
> [CARPENTER]: He has.
>
> [DEFENSE COUNSEL]: . . . [N]o, he [has not].  [Carpenter] has no money to hire an attorney, Your Honor.  In two weeks[, Carpenter] may—
>
> . . . .
>
> [T]here [was] an attorney that came up [on] Wednesday and talked to me in court after visiting . . . Carpenter, [and he] said that he would like to be retained two weeks from now.

2 RP at 58-59.

The court denied Carpenter's request.  The court explained,

> Okay, well, this case was filed in July of 2021.  I think [there has] been at least a half a dozen warrants in this case, and [it has] been pending for almost three years.  And at this point, [we are] set for trial.
>
> We had a jury that came in that [we are] going to have to pay for, because now [we are] doing everything last minute.  And if [defense counsel] is ready to proceed to trial, and the [State is] ready to proceed to trial, then [that is] what [we are] going to do today.

1 RP at 59.

Carpenter interjected, explaining that a bond company was going to "release [his] collateral sometime within the next week or two," which would allow him to pay for an attorney.  2 RP at 59-60.

Nevertheless, the court decided that the parties were going to proceed with trial.  The court commented, "Okay, this is [the] time for trial.  Yesterday was actually [the] time for trial.  We have no Notice of Appearance from any attorney, and the case has been pending for three-and-a-half years."  2 RP at 60.  The court also referenced the fact that Carpenter had "posted almost $200,000 in bail in [the] case," and that he "chose to do that instead of hire an attorney."  2 RP at 60.

The court proceeded with Carpenter's trial.  The court ultimately found Carpenter guilty of one count of failure to register.  In its findings of fact and conclusions of law, the court made several findings of fact that aligned with the testimony at trial.  In one finding, however, the court

found that "Patterson indicated the RV was gone by the time that he kicked . . . Carpenter out," which did not align with Patterson's testimony at trial.[5]  CP at 62.

Regarding its conclusions of law, the court concluded that "Carpenter ha[d] two or more prior convictions of Failure to Register as a Felony Sex Offender, [and that Carpenter] knew of his registration requirements to notify the Sheriff's office within three days of moving."  CP at 62. Then, the court concluded:

> [T]he information provided by . . . Patterson [was] reliable, and the State proved beyond a reasonable doubt that . . . Carpenter failed to update his address within three business days and had moved from the [residence] on February 20th, 2021[,] and did not update his address within three business days.

CP at 63.

Carpenter was later sentenced to 50 months of confinement.

Carpenter appeals.

ANALYSIS

I.     CARPENTER'S RIGHT TO RETAIN PRIVATE COUNSEL

Carpenter argues that the trial court abused its discretion by denying his request for a continuance to afford him time to retain private counsel, violating his constitutional right to counsel of his choice.  We disagree.

---

[5] The exact exchange that took place regarding the RV is as follows:

> [STATE]: And how long was the RV there?
> [PATTERSON]: A few months.
> [STATE]: Was it still there after the 18th [or] the 20th?
> [PATTERSON]: It was.

2 RP at 87.

A.       Standard of Review

We review a trial court's denial of a defendant's request for a continuance to substitute private counsel for an abuse of discretion. *State v. Hampton*, 184 Wn.2d 656, 670, 361 P.3d 734 (2015). "A trial court abuses its discretion when its discretion 'is manifestly unreasonable, . . . is exercised on untenable grounds, or [based on] untenable reasons." *Id.* (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

B.       Right to Counsel of Choice

Both the state and federal constitutions guarantee a criminal defendant the right to select and be represented by one's preferred attorney. U.S. CONST. amend VI; WASH. CONST. art. 1, § 22. But this right is not absolute; a "defendant's choice has limitations, particularly when a defendant's desire to choose new counsel affects 'the public's interest in the prompt and efficient administration of justice.'" *Hampton*, 184 Wn.2d at 662 (quoting *State v. Aguirre*, 168 Wn.2d 350, 365, 229 P.3d 669 (2010)). A defendant cannot "insist on representation by a person who is not a member of the bar, [nor can they] demand that a court honor his waiver of conflict-free representation." *United States v. Gonzales-Lopez*, 548 U.S. 140, 152, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006).

"As the United States Supreme Court has observed, these situations are highly fact dependent, and '[t]here are no mechanical tests' that can be used." *Hampton*, 184 Wn.2d at 669 (alteration in the original) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964)). To this end, a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzales-Lopez*, 548 U.S. at 152 (internal citation omitted).

When a trial court considers a defendant's request for a continuance to seek alternative private counsel, it *can* consider the following factors:

> (1) whether the request came at a point sufficiently in advance of trial to permit the trial court to readily adjust its calendar;
> (2) the length of the continuance requested;
> (3) whether the continuance would carry the trial date beyond the period specified in the state speedy trial act;
> (4) whether the court had granted previous continuances at the defendant's request;
> (5) whether the continuance would seriously inconvenience the witnesses;
> (6) whether the continuance request was made promptly after the defendant first became aware of the grounds advanced for discharging his or her counsel;
> (7) whether the defendant's own negligence placed him or her in a situation where he or she needed a continuance to obtain new counsel;
> (8) whether the defendant had some legitimate cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation;
> (9) whether there was a "rational basis" for believing that the defendant was seeking to change counsel "primarily for the purpose of delay";
> (10) whether the current counsel was prepared to go to trial; [and]
> (11) whether denial of the motion was likely to result in identifiable prejudice to the defendant's case of a material or substantial nature.

*Hampton*, 184 Wn.2d at 669-70 (quoting 3 WAYNE R. LAFAVE ET AL., Criminal Procedure § 11.4(c), at 718-20 (3d ed. 2007)). "Not all factors will be present" and, because of this, "a trial court need not evaluate every factor in every case." *Id.* at 670. Moreover, a "trial court[] can consider *all [other] relevant information*" when making its decision. *Id.* at 669 (emphasis added).

In *Hampton*, the parties jointly moved for a continuance, postponing Hampton's trial. *Id.* at 660. Following the first continuance, on the new trial date, "Hampton moved to replace his appointed counsel with a new private attorney," and "[t]he replacement was contingent on the trial court granting a [second] continuance to allow the new private attorney to prepare for trial." *Id.* at 660-61. "Hampton explained that he had not had a good relationship with his court-appointed counsel and that he had recently obtained funds to hire a private attorney." *Id.* at 661. The State

opposed the continuance because "it was untimely[,] . . . would [further] delay the trial," and "the victim opposed the continuance." *Id.*

The trial court denied the continuance. *Id.* The court reasoned that there was an insufficient basis to grant such request on the day of trial. *Id.* And the court also considered "that Hampton's appointed counsel was 'a very capable attorney,'" as well as the fact that the victim opposed the continuance. *Id.* The only factor that supported granting a continuance was Hampton obtaining funding for a private attorney. *Id.* Hampton was convicted and he appealed. *Id.*

Our Supreme Court ultimately affirmed Hampton's conviction, concluding that the trial court did not abuse its discretion in denying his request for a continuance. *Id.* at 672. When reviewing the trial court's decision, our Supreme Court acknowledged that "the trial court *did not actually apply*" the then-existing test. *Id.* at 671 (emphasis added). Nevertheless, the court concluded that the trial court considered several factors, such as "the readiness of Hampton's existing counsel," and "whether Hampton's desire for different counsel was justified." *Id.* In other words, the court affirmed despite the trial court not mechanically addressing every factor. *Id.* at 670-71.

### C. The Trial Court Did Not Abuse its Discretion

Here, Carpenter asserts that the trial court improperly denied his request for a continuance to allow him to retain private counsel in three instances: the readiness hearing, the hearing specifically considering his motion for a continuance, and the day of trial. But when carefully reviewing the record, it is evident that Carpenter's right to counsel of choice was only implicated in two of the three instances: On February 9, the hearing considering Carpenter's motion for a continuance, and on February 14, Carpenter's trial where he renewed his request to seek alternative counsel.

11

At no point during the readiness hearing did Carpenter specifically request a continuance so he could have time to retain private counsel. Instead, Carpenter claimed that he was not ready for trial because he did not have an opportunity to talk with defense counsel about his defense, which was directly contradicted by defense counsel's statement that they had "talked to [Carpenter] many times." 1 RP at 28. It was not until Carpenter's motion for a continuance, filed hours after the readiness hearing, where he specifically requested the opportunity to retain private counsel. And defense counsel filed the motion for a continuance at the suggestion of the trial court.[6, 7]

Carpenter claims that the trial court abused its discretion because it did not engage in the balancing test articulated in *Hampton*. Although the trial court did not expressly consider the *Hampton* framework in either instance, it did not abuse its discretion.

To begin, there is no instance in *Hampton* where our Supreme Court said that a trial court *must explicitly consider the factors it adopted*. 184 Wn.2d at 670. In fact, the court said the opposite, explaining that "a trial court need not evaluate every factor in every case." *Id.* at 670. And even when the trial court in *Hampton* did not explicitly address the then-existing framework, the court concluded that the trial court did not abuse its discretion in so doing. *Id.* at 670-71.

---

[6] Specifically, the court said, "[Defense counsel,] you're free to note it back on the record for a request for a continuance after you speak with Mr. Carpenter, if you feel that's appropriate." 1 RP at 29.

[7] We reverse the general denial of a motion for a continuance only when "it was 'so arbitrary as to violate due process.'" *Hampton*, 184 Wn.2d at 663 (quoting *Ungar*, 376 U.S. at 589). It can hardly be said that the trial court's actions fell below this standard when it permitted Carpenter to note a hearing that would specifically consider a continuance after the readiness hearing.

It is important to remember that it was the sixth trial setting for the case, and the trial court expressed its concerns about complying with Carpenter's right to a speedy trial. In light of Carpenter not having the opportunity to review a waiver with defense counsel, the only logical option available to the trial court at this time was to tentatively set a trial date and consider a continuance at a later date.

Additionally, the trial court here, like in *Hampton*, implicitly addressed, or was made aware of, several of the factors at both hearings. *Id*.

At the hearing considering Carpenter's motion for a continuance, for example, the trial court acknowledged that the request came "less than a week prior to trial" (Factor 1). 1 RP at 34; *Hampton*, 184 Wn.2d at 669-70. The State proffered that Carpenter's motion was a delay tactic (Factor 9), which was supported by the fact that Carpenter had witnesses that needed to be interviewed, but he had not provided that information to defense counsel, the State, or the court. *Id*. And both defense counsel and the State indicated that there had been no notice of appearance filed by any attorney; there was no assertion that Carpenter had actually hired an attorney. *Id*. With that in mind, the court determined that "having another attorney stepping in" was not "reasonable or appropriate." 1 RP at 34.

On the day of Carpenter's bench trial, where Carpenter renewed his request to retain a private attorney, the court again noted the untimeliness of Carpenter's request. The court explained that everything was being done "last minute" (Factor 1), and that Carpenter's case had "been pending for three-and-a-half years." 2 RP at 59-60; *Hampton*, 184 Wn.2d at 669-70. And both defense counsel and the State represented that they were prepared to go to trial (Factor 10). *Id.*

The court also recognized that no notice of appearance had been filed in the case. This was supported by the remarks made by defense counsel, who said that they had "represented . . . Carpenter for a year," and at no point had anyone "come forward saying [that they were] retained counsel." 2 RP at 58. Indeed, Carpenter had claimed that Kirk Davis was going to file a notice of appearance since April 28, 2022. But it never happened, and then, on the day of trial, Carpenter claimed a different attorney, Christopher Baum, was going to be retained.

It is true that defense counsel did acknowledge that an attorney talked with them about visiting Carpenter and how they would like to be retained in two weeks, but there was nothing definite. And Carpenter had not yet acquired the funds to hire the attorney because he was waiting for a bond company to release his collateral. There was also no indication how much time the attorney would need to prepare for trial.[8]

Therefore, we conclude that, in light of the *Hampton* factors implicitly addressed by the trial court, as well as other information brought to the court's attention, the court did not abuse its discretion.[9]

II.    SUFFICIENCY OF THE EVIDENCE

Carpenter argues that insufficient evidence supports his conviction because he never moved from the residence. We disagree.

A.    Standard of Review

To satisfy due process, the State must prove every element of the crimes charged beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005); *In re Winship*, 397

---

[8] The trial court also recognized that Carpenter "posted almost $200,000 in bail. . . instead of hir[ing] an attorney." 2 RP at 60. Carpenter argues that the trial court "improperly penalized" him for "post[ing] bail rather than remain in confinement on an unproven charge," explaining that his right to post bail is protected by article 1, § 20 of the Washington State Constitution. Br. of Appellant at 29. Carpenter cites to *State v. Burke*, 163 Wn.2d 204, 181 P.3d 1 (2008), and *In re Pers. Restraint of Addlemen*, 139 Wn.2d 751, 991 P.2d 1123 (2000), for support. Neither case addresses the right to post bail in the context of a defendant's right to counsel of choice. *Addlemen*, 139 Wn.2d at 753-56; *Burke*, 163 Wn.2d at 221. Because of this, Carpenter fails to provide relevant legal authority to support this constitutional challenge. *See State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) (parties wishing to raise constitutional issues on appeal must provide relevant legal authority). Without more, we decline to address this issue.

[9] In Carpenter's reply brief, he demonstrates that several of the *Hampton* factors did not support denying his motion for a continuance. But the trial court did, implicitly, address other factors and ultimately found them to be persuasive. Because of this, it cannot be said that the trial court's decision was one that "no reasonable person would take." *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990) (explaining the abuse of discretion standard of review).

U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The test for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, *any rational trier of fact* could have found [the defendant] guilt[y] beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (emphasis added); *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025).

We review all evidence in the light most favorable to the State. *Roberts*, 5 Wn.3d at 231. "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Therefore, the court must draw "all reasonable inferences from the evidence in favor of the State and against the defendant." *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). And we defer to the factfinder regarding "questions of credibility, persuasiveness, and conflicting testimony." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011); *Roberts*, 5 Wn.3d at 234-35.

When we evaluate the sufficiency of the evidence supporting a conviction, we consider circumstantial evidence to be as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see also O'Neal*, 159 Wn.2d at 506 ("Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient.").

Following a bench trial, a trial court must enter written findings of fact and conclusions of law. *Roberts*, 5 Wn.3d at 234; CrR 6.1(d). Unchallenged findings of fact are verities on appeal. *State v. A.M.*, 163 Wn. App. 414, 419, 260 P.3d 229 (2011). "Findings must address all ultimate facts and material issues that carry influence or are essential to the conclusions. Ultimate facts are the essential and determinative facts supporting a conclusion; they must support the conclusions

15

of law." *Roberts*, 5 Wn.3d at 234 (internal citation omitted). We "review challenges to a trial court's conclusions of law de novo." *Id.* at 237.

### B. Failure to Register

"A person commits the crime of failure to register as a sex offender if [they] . . . knowingly fail[] to comply with any of the requirements under RCW 9A.44.130." RCW 9A.44.132(1). When a person ceases to have a "fixed residence," they must "provide signed written notice to the sheriff of the county where he or she last registered within three business days." RCW 9A.44.130(6)(a). A "fixed residence" is defined as "a building that a person lawfully and habitually uses as a living quarters a majority of the week." RCW 9A.44.128(6). "'Habitually' means 'consistently, persistently, repeatedly, usually.'" *State v. Cathers*, 13 Wn. App. 2d 29, 33, 461 P.3d 375 (2020) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1017 (1993)).

In *Cathers*, Division Three of this court considered a sufficiency of the evidence challenge where the defendant claimed that they did not need to update their "fixed residence" because they were only "temporarily gone." *Id.* at 30, 33. The court observed that Cathers was absent from the residence "7 to 12 days," while he was traveling. *See id.* at 30. The court in *Cathers* reversed the defendant's conviction, reasoning that "[a] person who uses a building as his or her living quarters, yet is occasionally away for one or two weeks, still 'habitually' lives there a majority of the week." *Id.* at 33.

### C. Sufficient Evidence Supports Carpenter's Conviction

Here, like *Cathers,* Carpenter argues that there is insufficient evidence to support that Carpenter knowingly ceased to live at his "fixed residence" in Longview. *Cathers*, 13 Wn. App. 2d at 33. But when viewing the evidence in the light most favorable to the State, there is sufficient evidence to support Carpenter's conviction.

At the outset, Carpenter only challenges finding of fact 8, where the court found that "Patterson indicated the RV was gone by the time that he kicked . . . Carpenter out." CP at 62. This finding was not supported by substantial evidence because Patterson clearly testified at trial that the RV was at the residence after the fight on February 20, 2021. But this is inconsequential. The record supports that Carpenter was aware of the requirements for sex offenders. Prior to his release, Carpenter met with Hammer and went through all "the rules and obligations of the offender," including the requirements regarding offenders who moved to a new address. 2 RP at 65. And there is no dispute that Carpenter was previously convicted of failure to register as a sex offender on two prior occasions.

The trial court's remaining findings of fact are supported by substantial evidence. Patterson testified that Carpenter, after the fight, left in "a U-Haul rental truck," and ceased to live at the residence. 2 RP at 75. Carpenter did not stay at the residence, nor did he stay in the RV parked in the backyard. Patterson also said that "there was no reason for [him] to believe that [Carpenter] had been" at the residence since their fight. 2 RP at 80.

Gibbs's testimony supported Patterson's portrayal of events. After his brief stop at the residence, Gibbs concluded that he had "no reason to believe anybody besides [Patterson] . . . was living there." 2 RP at 72. Although, the trial court acknowledged that this fact alone was not "highly convincing" of Carpenter's guilt. 2 RP at 105.[10]

Consequently, this case is different from *Cathers* because the record does not support Carpenter was merely temporarily gone from the residence. *Contra Cathers*, 13 Wn. App. 2d at

---

[10] At trial, Carpenter presented a competing narrative about the events following his fight with Patterson. Ultimately, the trial court determined that Patterson's and Gibbs's testimony was more credible than Carpenter's. Because we defer to the trial court regarding "questions of credibility, persuasiveness, and conflicting testimony," we accept the court's interpretation of the evidence. *Martinez*, 171 Wn.2d at 364; *Roberts*, 5 Wn.3d at 234-35.

33. Instead, he had ceased to live at his fixed residence, requiring him to notify the county's sheriff in compliance with RCW 9A.44.130(1)(a). He did not do so.

Therefore, we conclude that the trial court's findings of fact are supported by substantial evidence and the findings support the conclusions of law. When viewing all of the evidence in the light most favorable to the State, a rational trier of fact could have found Carpenter guilty of failure to register beyond a reasonable doubt, and sufficient evidence supports his conviction.[11]

III.    CARPENTER'S RIGHT TO CONSULT PRIVATELY WITH COUNSEL

For the first time on appeal, Carpenter argues that the trial court also violated the Sixth Amendment to the United States Constitution by depriving him of the ability to privately confer at critical stages of the proceedings. Because Carpenter does not succeed in showing that his claim implicates a manifest error affecting a constitutional right under RAP 2.5(a)(3), we decline to review his unpreserved claim.

A.    RAP 2.5(a)(3)

Generally, courts do not consider issues raised for the first time on appeal. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a). An issue, however, may be raised for the first time on appeal if there is (1) a "lack of trial court jurisdiction," (2) a "failure

---

[11] Carpenter argues that "[t]he State failed to prove that . . . Carpenter had reason to believe his continued use of the property after the February 20th dispute was unlawful." Br. of Appellant at 51. To that end, Carpenter claims that "[t]here was no reason for . . . Carpenter to believe that, contrary to the basic principle of community property in marriage, . . . Patterson could legally prohibit [Carpenter] from using or residing at any of the buildings on the property." Br. of Appellant at 52.

Whether Patterson could prohibit Carpenter from staying on the property is irrelevant to the issue before us. Carpenter's conviction was based on him failing to register a new address, which could occur regardless of him being able to lawfully stay at the residence he previously shared with Patterson.

to establish facts upon which relief can be granted," or (3) a "manifest error affecting a constitutional right."  RAP 2.5(a); *McFarland*, 127 Wn.2d at 332-33.

To satisfy RAP 2.5(a)(3) "and raise an error for the first time on appeal, [a defendant] must" first demonstrate that "the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).  Then, a defendant must prove that the error was manifest. *Id.*  If a party raising an argument for the first time on appeal fails to satisfy the exception articulated in RAP 2.5(a)(3), we may decline to review the issue.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).  Actual prejudice requires a "'plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'"  *Id.* (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

B.      Right to Consult Privately with Counsel

Both the Sixth Amendment to the United States Constitution and article 1, § 22 of the Washington State Constitution guarantee the right to counsel.  *State v. Heng*, 2 Wn.3d 384, 388, 539 P.3d 13 (2023).  Because of this right, a defendant must have the ability to confer with counsel privately.  *State v. Hartzog*, 96 Wn.2d 383, 402, 635 P.2d 694 (1981).  But the right to confer privately with counsel is only applicable "at all critical stages of the proceedings." *State v. Dimas*, 30 Wn. App. 2d 213, 219, 544 P.3d 597, *review denied*, 3 Wn.3d 1026 (2024).

Whether a proceeding is a "critical stage" is not dependent on the type of hearing.  *Heng*, 2 Wn.3d at 392.  Instead, we look to "a hearing's 'substance and not merely [its] form.'"  *Id.* (alteration in the original) (quoting *State v. Jackson*, 66 Wn.2d 24, 28, 400 P.2d 774 (1965)).  "[A] critical stage [of a criminal proceeding] is one where a defendant's rights were lost, defenses were

waived, privileges were claimed or waived, or the outcome of the case was otherwise substantially affected." *Heng*, 2 Wn.3d at 394.

"The ability for attorneys and clients to consult privately need not be seamless, but it must be meaningful." *State v. Schlenker*, 31 Wn. App. 2d 921, 935, 553 P.3d 712 (2024). "[I]t is the trial court's role to ensure that attorneys and clients have the opportunity to privately consult." *Dimas*, 30 Wn. App. 2d at 219. When "determining whether a court has violated a defendant's right to confer with counsel, we 'should consider the totality of the circumstances, including whether the trial court explicitly established a process for such communications, given the variety of different circumstances that may occur.'" *State v. Ferguson*, 34 Wn. App. 2d 908, 920, 568 P.3d 314 (2025) (emphasis omitted) (quoting *State v. Bragg*, 28 Wn. App. 2d 497, 507, 536 P.3d 1176 (2023)), *review denied*, 5 Wn.3d 1036 (2026).

C.      Carpenter Does Not Satisfy RAP 2.5(a)(3)

Here, Carpenter claims that the trial court deprived him of the ability to confer privately with counsel at two junctures: the readiness hearing and the hearing considering his motion for a continuance. And Carpenter argues that both hearings constituted a critical stages of the proceedings because both implicated Carpenter's request for a continuance so he could retain private counsel.

As previously discussed, the trial court did not consider Carpenter's request to retain private counsel at the readiness hearing. Instead, Carpenter requested a continuance solely on the basis that he was not ready to move forward with trial. And it was only after the hearing Carpenter indicated that he was requesting a continuance, in part, to retain private counsel. Because of this, the readiness hearing did not constitute a critical stage of a criminal proceeding, meaning that

Carpenter did not have a right to confer privately with counsel. *Heng*, 2 Wn.3d at 392; *Dimas*, 30 Wn. App. 2d at 219.

The same cannot be said for the hearing specifically considering Carpenter's motion for a continuance. There, Carpenter made clear that he wanted a continuance to have time to seek out private counsel. As a result, Carpenter does demonstrate that his claim implicates a constitutional right. *Dimas*, 30 Wn. App. 2d at 219. But Carpenter must still demonstrate that any alleged error was manifest. *Ferguson*, 34 Wn. App. 2d at 922. Carpenter fails to do so.

Carpenter cannot demonstrate how consulting privately with counsel at the hearing considering his motion for a continuance "would have made any difference in the proceedings." *Id.* (holding that the trial court's failure to advise the defendant of his right to confer privately with counsel was not manifest because it would not have impacted the proceedings); *see also Dimas*, 30 Wn. App. 2d at 221-23 (similarly holding that the alleged error was not manifest because "even if [the defendant] had spoken with defense counsel at the hearing, he fail[ed] to show that the result would have been different"). At the hearing, the court explained that a continuance was not "reasonable or appropriate" when it was "less than a week prior to trial." 1 RP at 34. Moreover, the court took issue with the fact that no attorney had filed a notice of appearance. It was also unclear how long of a continuance Carpenter was requesting and how much time an attorney would need to prepare for trial if Carpenter was able to retain counsel. In sum, even if Carpenter could have consulted privately with defense counsel, there was no indication that the trial court was open to granting Carpenter's request.

Therefore, we conclude that Carpenter has failed to demonstrate that the alleged error constituted a manifest error affecting a constitutional right. As such, we decline to review this unpreserved error.

IV.     STATEMENT OF ADDITIONAL GROUNDS

We will consider an issue raised in a SAG only when it adequately informs us of "the nature and occurrence of alleged errors."  RAP 10.10(c); *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).  We do not address claims on direct appeal that depend on evidence outside the record on appeal.  *McFarland*, 127 Wn.2d at 338.

A.      Patterson Testifying at Trial

Carpenter argues that Patterson should not have been allowed to testify against him at trial.  Even if Carpenter identified any legal basis to support his argument, which he does not, he did not object to Patterson testifying at trial.  Consequently, any alleged error is unpreserved, and Carpenter must demonstrate how his claim falls within the exceptions enumerated in RAP 2.5(a).  Carpenter fails to do so, and we decline to address this argument for the first time on appeal.

B.      Plea Agreement

Next, Carpenter argues that the State violated a plea agreement that would have resulted in the State dropping the failure to register charge if (1) Carpenter completed drug treatment, and (2) Carpenter provided proof of his completion.  Carpenter claims that his former attorney, Kirk Davis, "has all [of] the emails between himself and the Cowlitz Co[unty] Prosecutor detailing the terms of the plea agreement."  SAG at 4.

There is no plea agreement in the record.  As explained in *McFarland*, "[i]f a defendant wishes to raise issues on appeal that require evidence or facts not in the existing in the trial record, the appropriate means of doing so is through a personal restraint petition, which may be filed concurrently with [a] direct appeal."  127 Wn.2d at 335.  Therefore, we decline to address this argument.

C.     Ineffective Assistance of Counsel

Finally, Carpenter argues that he received ineffective assistance of counsel because they did not interview any of the witnesses that Carpenter provided, nor did defense counsel have the witnesses testify at trial.  Because Carpenter does not explain how this resulted in prejudice, we disagree.

To prove ineffective assistance of counsel, a defendant must show (1) counsel's representation was so deficient it fell "'below an objective standard of reasonableness'" and (2) that deficiency prejudiced the defendant.  *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting and applying test from *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).  Failure to satisfy either requirement defeats the claim.  *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).

Prejudice requires showing that, but for counsel's deficient performance, "there is a reasonable probability . . . the result of the proceeding would have differed."  *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016).  "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (quoting *Strickland*, 466 U.S. at 694).

Here, Carpenter does not explain how defense counsel's alleged deficient performance prejudiced him.  In other words, Carpenter fails to show how there was "a reasonable probability" that his trial "would have differed" had defense counsel interviewed his witnesses and had them testify at trial.  *Estes*, 193 Wn. App. at 488.

Because Carpenter cannot demonstrate prejudice, we conclude his ineffective assistance of counsel claim fails.  *Bertrand*, 3 Wn.3d at 128.

CONCLUSION

Accordingly, we affirm Carpenter's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Maxa, J.

_____
Glasgow, J.